## F. E. Royston & Co. v. John Spry Lumber Co.

1. PREFERENCE—*When the First Execution is Set Aside.*—Where a later creditor files a bill and gets the first execution set aside, the next execution thereof, if levied before equity acquired jurisdiction, will be paid in its proper order. Legal rights and preferences, which are acquired before equity takes jurisdiction, will be respected in the distribution of assets.

2. SAME—*Bill in Aid of Execution.*—A bill filed in aid of an execution outstanding in the hands of the sheriff does not create an equitable lien as against prior valid execution liens which have previously attached to the same property. In such cases the complainant must finally get his payment by virtue of his execution, and can only get what his execution will, in its due legal order, bring him.

3. PARTNERSHIP—*The Right to Have the Firm Property Applied to Firm Debts.*—The right of a firm creditor to subject the firm property to the payment of his debt in equity, to the exclusion of the creditor of an individual partner, results solely from the right of the other partner to have the partnership assets applied to the payment of the partnership debts.

4. SAME—*Waiver of the Right to Have Firm Assets Applied in Payment of Firm Debts.*—A partner may waive his right to have the firm property applied to the payment of the partnership liabilities. When he does so, the equity of the creditor is at an end.

5. INJUNCTION—*When Not Necessary as Against a Sheriff.*—An injunction is not necessary against a sheriff who has proceeds of executions in his hands for distribution to different persons. A mere notice to him not to pay out the proceeds till the determination of the question is sufficient.

**Creditor's Bill.**—Appeal from the Circuit Court of LaSalle County; the Hon. HARVEY M. TRIMBLE, Judge, presiding. Heard in this court at the May term, 1899. Affirmed in part and reversed in part. Opinion filed October 12, 1899.

A. J. HOPKINS, F. H. THATCHER, F. A. DOLPH and C. P. GARDNER, attorneys for appellants.

HOPSON & HOLLEMBECK, McDOUGALL & CHAPMAN and ELMER H. ADAMS, attorneys for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

Prior to the entry of the judgments herein recited, Joseph W. Gregg, Daniel H. Gregg and Arthur A. Chapell were partners, as Gregg Brothers & Chapell, in the business of merchants at the village of Triumph in La Salle county. On December 2, 1897, judgments were entered against said firm, and executions issued and placed in the hands of the sheriff of said county in favor of the following named plaintiffs, for the amounts and in the order named, viz.: Elgin National Bank, $802.55; C. E. Chapell, $2,853.98; A.

E. Wheeler, $120; John Pritzloff Hardware Co., $492; Mendota National Bank, $275.73; F. E. Royston & Co., $557. On December 3, 1897, Madden & Goedtner recovered a judgment against said firm for $1,658.20, and had execution issued and delivered to the sheriff. He levied the first of these executions upon the tangible firm property, which was all personalty, and advertised it to be sold December 17, 1897. Prior in date to said judgments and executions was an execution from the Circuit Court of McHenry County, in favor of Edward Morton, against a former firm of Gregg & Lamson, for $322.25, which was also levied upon the interest of J. W. Gregg in said firm property. On December 6, 1897, John Spry Lumber Company (hereinafter called the Lumber Company) obtained two judgments against Gregg Brothers & Chapell, in the Circuit Court of La Salle County, one for $2,000, and the other for $640.81, and had executions issued thereon and placed in the hands of the sheriff, who by its direction retained the former but returned the latter *nulla bona.* Thereupon the Lumber Company filed a general creditor's bill against said debtor firm and Madden & Goedtner, based upon its said judgment for $640.81, execution upon which had been returned *nulla bona.* The main object of the original bill was to obtain a receiver and get control of the book accounts and bills receivable, some interest in which had already passed to Madden & Goedtner. A receiver was appointed and a part of said book accounts and bills receivable passed to his possession and were collected and distributed in a manner not here in controversy. The receivership did not relate to the property previously levied upon by the sheriff, nor affect his sale thereof. On December 15, 1897, the Lumber Company filed an amended bill attacking the judgments of Morton, C. E. Chapell and Madden & Goedtner, and charging that C. E. Chapell was a member of the firm of Gregg Brothers & Chapell, and that A. A. Chapell was only the representative and agent of C. E. Chapell in said firm. The prior judgment and execution creditors were made defendants. On December 16, 1897, the Lumber Company obtained

an injunction staying a sale by the sheriff under the Morton execution, and directing that after sale under the other executions the sheriff retain the proceeds as a fund in lieu of the property levied upon, and subject to all the rights of the parties as they might thereafter be determined. The bill was afterward again amended. It was answered by most of the defendants, and F. E. Royston & Co. filed a cross-bill, which was answered. The court heard the proofs, and on March 8, 1899, entered a decree. Of its many details only those need be stated which affect the matters of which complaint is here made in argument. The decree found that the judgment in favor of C. E. Chapell was by confession upon three judgment notes; one dated November 5, 1896, for $1,000, with interest at six per cent; one dated January 15, 1897, for $500, with interest at seven per cent; and one dated March 10, 1897, for $1,000, with interest at six per cent—the first and last each with an attorney fee; that interest had been paid on said several notes to July 15, 1897; and that said note of November 5, 1896, was not signed by the firm but by the several members thereof individually, and was not given for a firm debt. The decree provided that C. E. Chapell should only be paid the amount due on his second and third notes on December 2, 1897 (thus cutting out not only the first note but also interest on any part of said judgment after that date, and the attorney's fees), and found that the executions of A. E. Wheeler and the John Pritzloff Hardware Company, and a balance remaining unpaid upon the execution of the Mendota National Bank, were entitled to be next paid, and that the Lumber Company was entitled to the balance of the fund in the hands of the sheriff prior to the other executions intervening between the executions of C. E. Chapell and the Lumber Company. It ordered the payment in full of the Wheeler and Hardware Co. executions and $141.72 on the Mendota Bank execution, and the payment to the Lumber Company of $985.68 on its $2,000 execution, being the balance, apparently, of the fund. The purpose seems to have been to pay those executions which

would have been paid from the fund in the hands of the sheriff if C. E. Chapell's execution had not been reduced, and then to pay the rest of the fund to the Lumber Company, thus giving the latter all the benefit of the reduction of C. E. Chapell's execution.  The Lumber Company's judgment of $640.81 was by the decree ordered paid out of the equitable assets in the hands of the receiver to the extent they would reach it after discharging prior liens upon said equitable assets.  The decree directed that out of the reduced amount to be paid C. E. Chapell the sheriff pay the costs arising out of the issues litigated between the Lumber Company and C. E. Chapell.  The amount in the hands of the sheriff was insufficient to reach the execution of F. E. Royston & Co. by the distribution ordered, while if said several executions following that of C. E. Chapell had been paid in the order in which they reached the sheriff and were levied, Royston & Co. would have been paid in full as the result of the reduction of C. E. Chapell's execution.  Royston & Co. and the Lumber Company each prayed appeals and filed appeal bonds.  Royston & Co. filed the present record, and the Lumber Company and C. E. Chapell respectively assigned cross-errors thereon.  C. E. Chapell complains because his execution was reduced and because he was deprived of interest and attorney fees and made to pay the costs.  The Lumber Company complains because the C. E. Chapell execution was not wholly set aside.  Royston & Co. complain because the Lumber Company was given priority over executions which were liens prior to its execution.  These complaints present the main questions argued here.

Arthur A. Chapell was the son of C. E. Chapell, and somewhat wild and inclined to spend money improperly. C. E. Chapell was instrumental in getting Gregg Brothers to take his son into partnership, but it is clear from the proofs (including a bill of sale to A. A. Chapell) that C. E. Chapell was not himself a member of the firm.  The note to C. E. Chapell for $1,000, dated November 5, 1896, and signed by the several members of the firm, was for money

which went into the firm business.   According to the
testimony of J. W. and D. H. Gregg it was money C. E.
Chapell loaned to his son A. A. Chapell to be put into the
firm as his son's share of the capital.   The Greggs testified
they signed the note at the request of C. E. Chapell, in
order to make A. A. Chapell feel under obligations to them,
but with a private understanding they would not be called
upon to pay it.   F. J. Hatheway testified A. A. Chapell
told him he considered the $1,000 note a personal debt of
his own to his father.   On the other hand C. E. Chapell and
A. A. Chapell testified that it was agreed by A. A. Cha-
pell and the Greggs, before this $1,000 was loaned, that the
firm should be responsible to C. E. Chapell for its repay-
ment.   Chas. A. Etnire and C. C. Chapell (another son of
C. E.) testified to admissions by D. H. Gregg that this was
a firm debt, and the cross-examination of the Greggs
weakened the apparent force of their testimony.   It is very
unusual for persons to sign a note for a large amount for
such a purpose, and with such a private unwritten counter-
agreement as they described.   Nor is it likely that when
this note was signed the Greggs saw any special difference
between the firm being responsible for repayment to C. E.
Chapell and each member of the firm being responsible
therefor, and to the latter, at least, their note shows they
then agreed.   The fact that the firm name is not signed,
perhaps tends to show that it was not regarded as a firm
debt, but is unimportant if the note was in fact for a firm
debt; at least, the Lumber Company can hardly contend
otherwise here, for both its execution for $2,000, upon which
a payment was by the decree herein directed, and its execu-
tion for $640.81, upon the return of which unsatisfied its
original bill was based, are against Daniel H. Gregg, Joseph
W. Gregg and A. A. Chapell individually, and not against
the firm by name, whereas the executions of C. E. Chapell,
John Pritzloff Hardware Co., Mendota National Bank,
F. E. Royston & Co., and Madden & Goedtner are
against the firm as such.   But the trial judge saw these
witnesses upon the stand, and could best judge of their

credibility, and we do not feel disposed to disturb his con-
clusions that the note of November 5, 1896, was not for a
firm debt. The other two notes entering into the C. E.
Chapell judgment clearly were given for money loaned the
firm. In those respects we affirm the decree.

The Lumber Company, however, urges that the execution
of C. E. Chapell should be wholly postponed to that of the
Lumber Company because of certain correspondence. Under
date of September 7, 1897, the Lumber Company wrote C.E.
Chapell (who lived at Elgin, Illinois) a letter, the body of
which was as follows:

" Your son, of Gregg Bros. & Chapell, called upon us this
morning and referred us to you as to the financial standing
of Gregg Bros. & Chapell. We are selling them lumber
and the commercial reports give us no definite informa-
tion as to their financial standing. Will you please advise
us if you consider them a good risk for an open account of
$1,000 or thereabouts. You might at the same time advise
us as to their assets and liabilities, so far as you know. Of
course we expect you to treat this the same as though your
son was not in the concern, freely and fairly. A prompt
reply will oblige."

To this he replied on the 9th as follows:

" Your letter of the 7th, regarding Gregg Bros. & Cha-
pell, of which my son is a member, is at hand. Would say
in reply that my attention was called to the opening, and
an opportunity to secure a one-third interest for my son,
last November. I went down and investigated and was
very favorably impressed with the outlook for building up
a very nice business. To be sure they started with limited
capital, each putting in one thousand dollars. The busi-
ness picked up so fast that in the three departments they
needed more funds and I assisted them to $2,250. I
have been down once or twice a month to watch their
methods and find they are running it very careful and with
light expense. The money I have advanced is a personal
loan to the firm and my intention is to carry it myself and
give them time to meet the figures—sixty or ninety days
bills—to the houses with whom they do business. The last
time I was down we ran through the stock and found they
had some over $2,000 in the hardware department, $2,500
in the lumber and $4,500 in all, store fixtures, etc., and nearly

$3,000 on their books against a good class of farmers. Their outstanding debts to different firms at that time was about $4,000. With present advance in produce, their collections are very much better, as money is coming in more fast, and I can see no reason why they can not meet their bills at maturity, and I think they will be in shape to discount their bills at sight, as I deem the first year the hardest one.

P. S.—I intend to keep familiar with the business, and advise with them from time to time, and do all I can to make it a success."

It is not charged any part of this letter was untrue when written. It disclosed a firm indebtedness of $6,250; enough, surely, to put the Lumber Company on its guard. It disclosed that C. E. Chapell intended to give the firm time on their debt to him, but it said nothing which bound him to inactivity if he found the firm was going to fail. Nor did any officer of the Lumber Company testify (so far as the abstracts show) that it was induced to give credit to the firm because of said letters, the nearest approach thereto being the testimony of one Westgate, that he heard C. E. Chapell say if it had not been for him the firm would not have got their lumber on time; that it was through his influence with the Lumber Company that they trusted him. But if said letter is subject to the construction now put upon it by the Lumber Company, yet the Lumber Company did not, in its original or amended bill or any amendments thereto, set up any such case against C. E. Chapell, or allege it had been misled or defrauded by him, or plead such letter or any estoppel against him as a reason why the Lumber Company's execution should be given priority over his. In the absence of allegation there could be no relief given the Lumber Company because of said letter.

We are of opinion C. E. Chapell should not have been deprived of interest upon that part of his judgment which was based upon his notes dated January 15, and March 10, 1897, nor of the $10 attorney fees, provided in the last note. The other $1,000 note included in the judgment was a *bona fide* debt of the several members of the firm for money which went into the business. It is not shown that it was

F. E. Royston & Co. v. John Spry Lumber Co.

included in the judgment against the firm for any fraudulent purpose. The question whether it was not agreed, at the time, that the loan should be a firm debt, is too close from the evidence to warrant any conclusion it was put in judgment against the firm for any wrongful purpose. C. E. Chapell should have been paid so much of the principal of his judgment as was based upon said notes of January 15 and March 10, 1897, and said attorney's fee of $10, and interest upon that part of said judgment from December 2, 1897, to December 17, 1897, the date of the sheriff's sale, when distribution would have been made but for the motion of said Greggs and said injunction order. We also hold C. E. Chapell should not have been so heavily mulcted in costs. The amended bill charged him as a partner, and the Lumber Company failed in that contention. It attacked his entire judgment, and succeeded only as to about two-fifths of it. We understand that the costs and expenses of the receivership have been paid out of the fund obtained by the receiver, and think it more equitable that the other taxable costs should be divided, C. E. Chapell, the Lumber Company, and the fund in the hands of the sheriff, each paying one-third.

Was the Lumber Company entitled to be paid upon its execution, being the eighth that was levied, to the extent the C. E. Chapell execution was reduced, in preference to the executions which intervened between those of C. E. Chapell and the Lumber Company?

First. This is not a case where the Lumber Company discovered assets which had not been reached by the creditors having prior executions. Each execution of the seven preceding that of the Lumber Company was a lien upon all this property, and was such lien before the Lumber Company had even obtained its notes, upon which it afterward recovered judgments and obtained an execution which became a later lien upon the same property. We think it settled by Atwater v. American Exchange National Bank, 152 Ill. 605, that where a later creditor files a bill and gets the first execution set aside, the next execution thereto, if

levied before equity acquired jurisdiction, will be paid in its proper order. It was there said : "Legal rights and preferences which are acquired before equity takes jurisdiction will be respected in the distribution of assets." In that · case judgments were obtained, executions issued and levied upon the property of the debtor in the following order, viz.: Wm. E. Atwater, American Exchange National Bank, Harrington & Goodman and Victor D. Gowan. Thereafter other creditors filed a bill which resulted in the defeat of the Atwater execution. Upon rehearing it was held that the next three executions would take the avails of the sale in the order they were levied till the proceeds were exhausted. The amended bill in this case was filed in aid of the Lumber Company's $2,000 execution. The proper purpose of such a bill is not to advance the complainant's execution over other prior valid executions, but to remove some obstacle, such as a prior invalid execution, so that if possible the proceeds of property sold on execution may reach complainant's execution. In this case the debtors are not found to have done anything fraudulent, or even wrongful, for they did not sign the firm name to the C. E. Chapell $1,000 note, and no equitable assets were discovered by the amended bill; but the assets out of which the Lumber Company has obtained priority for its $2,000 execution are personal chattels which were in the hands of the sheriff under other valid and prior executions before the Lumber Company obtained its judgments and executions and resorted to a court of equity. A bill filed in aid of an execution, outstanding in the hands of the sheriff, does not, in our judgment, create an equitable lien as against prior valid execution liens which have previously attached to the same property. In such case the complainant must finally get his payment by virtue of his execution, and can only get what his execution in its due legal order will bring him.

Second. It is clear from the oral and documentary evidence that Gardner, acting as attorney for the Mendota National Bank and F. E. Royston & Co., and Clark, a member of the latter firm, first ascertained that this $1,000 note

of November 5, 1896, was claimed by the Greggs not to be a partnership debt; and that they induced the Greggs to direct their attorney to enter a motion in C. E. Chapell's case to vacate the judgment and for leave to plead as to the $1,000 note. Wheeler, attorney for the Greggs, was then consulted by Gardner and Clark, as to the course to be pursued to present this matter to the court. All this was before the Lumber Company obtained even the notes upon which were based its judgments, executions and first creditor's bill. By the procurement of Gardner and Clark, a full affidavit of the facts was prepared by Wheeler, signed and sworn to by D. H. and J. W. Gregg, and filed and the motion entered in the cause by the Greggs on December 15, 1897. The amended bill of the Lumber Company, alleging said $1,000 note was not a firm debt, was filed the same day, but it was filed after the Greggs had made their motion to vacate the judgment and had filed their affidavit, for said amended bill sets up the entry of said motion and the filing of said affidavit in support thereof, and makes formal reference thereto. True, the amended bill purports to have been sworn to in Chicago the day before, December 14th, but if that date is not an error, then the reference to said motion and affidavit must have been written in after the amended bill was sworn to and before it was filed, unless, indeed, as is very likely, the solicitor for complainant knew of the preparation of said motion and affidavit, and supposed it had been theretofore filed. The affidavit to the amended bill states that complainant did not know the facts therein set forth (of which this $1,000 matter is one) when it filed its original bill on December 6th; but Gardner and Clark ascertained the facts on December 3d. The written motion of the Lumber Company for an order to stay distribution of the proceeds by the sheriff after he should sell, is expressly based upon the motion entered by the Greggs to vacate the judgment of C. E. Chapell, and upon their affidavits so procured by Gardner and Clark. The injunction order recites and is based upon the fact that the Greggs had entered said motion in C. E. Chapell's case. It was after-

ward stipulated between C. E. Chapell and Gregg Bros. & Chapell in said action at law that said motion should abide the determination of this cause. The Lumber Company therefore was not the discoverer of the facts; it brought nothing to light not previously known to the prior execution creditors. It is clear the judgment could have been reduced to the proper sum owing by the firm on the motion entered by D. H. and J. W. Gregg, defendants therein. (Campbell v. Goddard, 117 Ill. 251; Cassem v. Brown, 74 Ill. App. 346.) The Mendota Bank and F. E. Boyston & Co. were pursuing a proper course in seeking to have the payment of the firm debts out of the firm assets worked out through the partners. The equity set up by the Lumber Company is not an original equity to which it is entitled as of its own right as a creditor of Gregg Bros. & Chapell. The equity is that of the partners only. Upon this subject the rule is thus stated in Young v. Clapp, 147 Ill. 76:

" The right of a firm creditor to subject the firm property to the payment of his debt in equity, to the exclusion of the creditor of an individual partner, results solely from the right of the other partner to have the partnership assets applied to the payment of the partnership debts. The rule is for the benefit and protection of the partners themselves. The equity of the creditor is of a dependent and subordinate character, and is to be worked out and enforced through the medium of the equities of the partners. A partner may part with his right to have the firm property applied to the payment of the partnership liabilities. When he does so, the equity of the creditor is at an end." (Ladd v. Griswold, 4 Gilm 25; Farwell v. Huston, 151 Ill. 239.)

The Mendota National Bank and F. E. Royston & Co. procured the partners to act and enter the proper motion. They did it immediately after the failure and before the Lumber Company had either notes or judgment. They ought not to be deprived of the results of their diligence. No injunction against the sheriff was necessary. A mere notice to him not to pay out the proceeds till the determination of the motion would have been sufficient. True, that notice had not been given on December 15th, when the amended

bill was filed, but as the sale was to be held on the 17th, there was plenty of time for that. We do not hold the Lumber Company had no right to file its amended bill and get an injunction if it saw fit, but only that such course was unnecessary; that the Lumber Company was not the first creditor to discover the facts and set in motion measures to prevent C. E. Chapell recovering money upon his first note, and that the Lumber Company has not, by its bill, entitled itself to payment out of the order in which the executions were received by the officer.

We are of opinion the proposed amendment to the Lumber Company's amended bill, attacking the judgment of the John Pritzloff Hardware Co., did not bring that corporation within the terms of the statute invoked, and did not show grounds entitling the Lumber Company to equitable relief, and that it was not error to refuse leave to file it.

The decree of the court below is reversed so far as we have herein indicated that it is erroneous, and in all other respects it is affirmed; and the cause is remanded to the court below with directions to modify its decree in conformity with the views herein expressed. The costs of this court will be adjudged against the John Spry Lumber Company. Affirmed in part and reversed in part.