King, J.,
delivered the opinion of the court.
Appellee brought its suit ag’ainst the appellant, a Colorado corporation, and Frank J. Macarthy, upon a promissory note for the sum of $3,850, executed by the said Macarthy and payable to the order of appellant. The note bore the endorsement in blank of the appellant’s corporate name, by the said Macarthy as president. It was alleged in the complaint that the note so endorsed was, in due course of business, delivered by appellant to one E. A. Colburn, and that thereafter appellee became the owner “by delivery of said note to it by said Colburn.” Macarthy made no defense. Appellant denied delivery of the note to it, as well as its endorsement and delivery to Colburn in due course of business, or otherwise, put in issue the bona fides of the bank as the holder of said note, and alleged that appellant was a corporation organized under the laws of Colorado, with limited powers, without authority to execute or endorse promissory notes for accommodation; that said Macarthy, at the time of the execution, endorsement, and delivery of said note, was president of the appellant company, but with limited power to act for it; that he had no authority to endorse or deliver the note in the name of or for the company, and that the corporation at no time received or was the owner of the note; that the endorsement was without consideration moving to appellant; that it had no knowledge of the existence of the note, or the endorsement, until the day before its maturity when, upon receipt of written notice thereof from Colburn, it promptly repudiated the transaction.. It further alleged that the note was executed, endorsed and delivered by Macarthy to Colburn in the purchase of an automobile from Colburn, for the private use of Macarthy, and upon his sole and individual liability; that without authority or knowledge of the company he so made, endorsed, and *146 delivered the note, assuming to obligate the company for the payment of his private debt; that appellant was in no way liable for the indebtedness represented by the note.
The cause was tried to a jury. At the close of the testimony the court directed a verdict for the plaintiff, to which action of the court, as well as to the verdict and judgment, appellant duly excepted.
The chief error assigned and relied upon by appellant is that of the court in directing a verdict in favor of the plaintiff, and the conclusion reached by the court, upon that objection, is decisive of the case here, and renders any extended discussion of other assignments unnecessary; but some of them will be first disposed of. In view of Colburn’s testimony that he had not sold the note to the bank, but only delivered it for collection, the case will be considered as if commenced and prosecuted by Colburn.
1. Defendant objected to the calling and examination of Macarthy as if under cross-examination, and assigns as error the overruling of such objection in view of Macarthy’s default in making any defense. Macarthy was “a party to the record,” and we think came within the provisions of the statute permitting such examination by the adverse party. The court did not err in permitting him to be so examined.
2. Error was assigned to the action of the court in admitting statements made by Macarthy to Colburn at and prior to the time of the purchase, as to his agency and extent of authority. It is well settled that neither the fact of agency nor the extent of authority can be proved by the declarations of the alleged agent; and it is equally as well established that when an agent makes a contract, or does any act, representing his principal, his declarations made at the time, explanatory of the act, *147 are admissible in evidence on behalf of either party.— R. E. Lee S. M. Co. v. Engleback et al., 18 Colo., 106; Burson v. Bogart, 18 Colo. App., 449; Wales v. Mower, 44 Colo., 146. By the admissions in the pleadings and upon the trial that Macarthy was the president and general manager of the company and substantially in exclusive control of the company’s affairs in Colorado, his agency was established, and his declarations made at the time were, under the authorities cited, admissible.— Thompson on Law of Corporations, section 4850.
3. Had Macarthy,. as president and general manager, authority to purchase the machine in question and obligate the company for the purchase price, and did the court err in directing a verdict in favor of the plaintiff? The determination of these questions requires an investigation of the evidence.
Certain pertinent facts are undisputed, namely, that appellant was a corporation organized for the purpose of, and engaged in, buying and selling irrigated farm lands; that it- had offices in Des Moines, Iowa, and in Denver, Colorado; that Macarthy was its president and general manager, and, at the time of the execution and delivery of the note was, and for a long time prior thereto had been, practically in exclusive control and management of its business • in Colorado; that its chief business had been buying and selling lands located near G-reeley, Colorado, and that prospective purchasers, arriving from the east, were received at Denver and conveyed to and from the lands by automobiles, and that advertising matter sent out from Des Moines headquarters so advised the public; that at first autos were hired, but later Macarthy bought and used for the purpose a number (six or more), some of which were owned or claimed by him, but whether any belonged to the company is in dispute. The expense of maintaining and *148 operating the cars was paid by the company. The business had been so carried on for about a year at the time Macarthy first opened negotiations with Colburn, who was a dealer in automobiles. In July, 1905, at a meeting of the directors of the company in Des Moines, a by-law was adopted, limiting the authority of its president and general manager to bind the company by contracts of purchase involving the sum of $1,000 or more, until submitted to and approved and ratified by the board of directors. This by-law was not brought to the notice of Colburn. Ninety-seven per cent or more of the stock of the company was owned by Macarthy and J. K. Gil-crest, his father-in-law, who resided in Des Moines, the interests of the other stockholders and directors being nominal.
Colburn testified that in June, 1906, Macarthy approached him with regard to the purchase of a Locomobile “for the use of The Western Investment and Land Company,” stating that he was president of said company and had full authority to carry its business on, and wanted an automobile for the purpose of taking passengers to and from the land, as they came from the east; that he wanted to buy the machine on credit, and offered to give in payment one note due in six months, and one due in a year. Colburn made some inquiry about the standing of the company, and thereafter offered to sell the car on time if both the land company and Macarthy were bound. When Macarthy offered the notes they were in the form shown by the note sued upon in this ease, namely, executed by Macarthy, payable to the land company and endorsed in blank in the company’s name by Macarthy, its president. Colburn objected to the notes in that form, but accepted them upon Macarthy’s insisting that such was customary in the execution of notes by his company, and that he wanted them that way. *149 Colburn testified that at that time Macarthy told him that he was president of the company, and had full authority to carry on the business; that he and his father-in-law were the company, and that whatever he did was satisfactory to his father-in-law, and there would be no question about the payment of the notes. When the first note became due it was extended by another similar note until January, 1907, when it was paid by a company check issued by Macarthy, and the second note was paid in the same way when due. Neither payment, however, was made until after the making of the note sued upon. Prior to the sale of the locomobile Colburn’s knowledge of the company was chiefly that obtained from its advertisements of the land for sale, which showed that the company was selling land near Greeley, and that prospective purchasers were shown the same by automobile, and the fact that Macarthy or the company was using a number of automobiles, some of which were at times stored at Colburn’s garage. Colburn further testified that in November, 1906, Macarthy wanted to purchase a White Steamer limousine car, stating that he contemplated purchasing another car to use for prospective land purchasers, particularly ladies who were accompanying men who were inspecting lands, and wanted to • purchase that car the same as he had the locomobile — - on time by giving notes. This was agreed to, and oh November 20th, 1906, the" limousine was sold and the note sued on was received in payment of the samé. It does not appear from Colburn’s testimony that any other representations were made at that time, the former transaction and representations being relied npon as fixing the liability of the defendant. Macarthy testified that the conversation at the time of the second purchase “was along the same lines as the first.” The notes were not charged upon the books of the company, but whatever *150 account was kept of these transactions was upon'the private hooks of Macarthy. The limousine was used a few times in the company’s business, and was used by Ma-carthy and his wife in and about Denver. One of the directors residing in Denver knew of the use of the car, and said he understood it belonged to the company. The other directors and stockholders denied any knowledge or understanding that the. car belonged to the company, or that the company was. in any manner charged with the purchase price thereof, until the maturity of the note as hereinbefore” stated. Macarthy testified that there never was a clearly defined interest of the company or ok himself in any of the said cars, all being used for the company’s business and his own; that the first purchase of a car was under the order of three of the directors not including Gilcrest; that to his knowledge the by-law hereinbefore mentioned was never enforced; that he negotiated and concluded purchases of land, paying cash and giving notes in the company’s name, one transaction involving $134,000, and a number of others in substantial sums; that these were -reported either to the directors, or to his father-in-law.
There is no question of the power or authority of a company or corporation such as this to make purchase of automobiles that are necessary or useful in the operation of its business, and to give its promissory notes in payment therefor. — Daniels on Negotiable Instruments, section 382. Power of such corporation to execute notes or endorsements for accommodation is denied by the preponderance of authority.
The by-law of the company to which reference is elsewhere made, effectually disposes of any question of express authority conferred by the company on its president and general manager to obligate the company by the contract of purchase under consideration, for the *151 reason that the amount of such purchase was in excess of the limitation fixed by the by-law. On the other hand, such by-law is an express recognition of his right to mate contracts within the amount limited. What was his implied authority? The public would be absolutely without protection in dealing with corporations if it were not for the rule that their executive and managing officers, or agents, by whatever name called, possess implied power to bind the corporation by acts and contracts done and made in the conduct of ordinary business; and such being the law, an innocent stranger dealing with a corporation through such an agent will not be affected by any limitation of the agent’s authority contained in the by-laws and of which he has no knowledge. And the appointment of such general manager carries with it an implication of authority on the part” of such agent to represent himself as possessing the full powers usually ascribed to such an office. — Thompson on Law of Corporations, section 4850; Whitaker v. Kilroy, 70 Mich., 635, 638. The foregoing principles apply with peculiar force when, as in the instant case, the offices of president and general manager unite in one man, so that he becomes in effect the corporation itself so far as the public is concerned. It has been repeatedly held in this state that a manager of a private corporation in such business as the sale of lumber at retail, has no authority by virtue of his employment merely, to borrow money on the credit of his company, or to give its note therefor.—Rizzuto v. R. W. English L. Co., 44 Colo., 413; Breed v. First Nat’l Bank, 4 Colo., 481; Sanford Cattle Co. v. Williams, 18 Colo. App., 378; Hireen v. R. W. English L. Co., 46 Colo., 216. But these eases recognize the liability of the company for the debt if it has received the benefit of the contract, even though it may not be liable in a suit on a promissory note executed without authority. It is *152 said by Thompson in his work on corporations that the principle which governs the subject of implied authority of agents is, that one person cannot be made civilly answerable for the acts of another unless he has (1) clothed him with power to do those acts, or (2) clothed him with power to do acts which include those acts, or (3) allowed him, through negligence or otherwise,, to possess, in the face of the public, the appearance of such power; and we will add, or (4) ratified such acts. In either case the'power really emanates from the principal. —Thompson on Law of Corporations, section 4884.
In the present case the evidence shows that the company did not expressly clothe its manager with power to make the contract sued upon. There is evidence strongly, tending to show that it clothed him with power to do acts which included those other acts, and more strongly to prove that, through negligence or otherwise, it allowed him to.possess, in the face of the public, the appearance of such power, and that his acts pursuant to such apparent power came to the knowledge of Colburn. There is also evidence that both the directors and the stockholders, after the execution of the note, ratified all the acts of the company’s president and general manager. But the evidence as strongly tends to show that the company had no. knowledge of the execution of the note, or of the company’s endorsement, or the purchase of the car as' the company’s property, at the time of such ratification. From all of the evidence there is grave doubt of the authority assumed by the agent as well as of ratification by the company, with such knowledge as would bind it; and good reason to doubt the acceptance of the note by Colburn considering the company as anything but accommodation endorser for Macarthy.
Certain other matters were directly in issue the determination of which depends upon the evidence intro *153 dueed and the inferences to be drawn therefrom, even should the manager’s power to make the contract be conceded, namely, (1) Was the limousine car, for which the note was given, purchased by Macarthy for the company as its property and for its use, or by Macarthy as his individual property? (2) If the car was purchased by Macarthy individually, had Colburn knowledge of that fact, or of such matters as would charge him with notice and put him upon inquiry? It is settled in this state as a rule of law that if there is evidence which tends to establish plaintiff’s cause of action or defendant’s defense, it is error for the court to withdraw the case from the jury or to direct a verdict. It is not for the court to judge of the sufficiency of the evidence.—Lebanon Mining Co. v. Con. Rep. Mining. Co., 6 Colo., 371, 380; McQuown v. Thompson, 5 Colo. App., 466; Colo. Coal & Iron Co. v. John, 5 Colo. App., 213, 216; Blackman v. Edsall et al., 17 Colo. App., 429, 435; Monarch Mining & Dev. Co. v. DeVoe, 36 Colo., 270, 276. And it is likewise the rule that if the facts adduced are such that intelligent men may honestly differ as to the conclusions to be drawn from the evidence, even where there is no dispute as to the facts, the matter must be left to the jury.—Williams v. Sleepy Hollow Mining Co., 37 Colo., 62, 68; Empson Packing Co. v. Vaughn, 27 Colo., 71; Solly v. Clayton, 12 Colo., 33; Railway Co. v. Martin, 7 Colo., 599.
The evidence is not so clear and satisfactory that the court can say that there was no dispute as to material facts, or that different men might not honestly draw different conclusions or inferences from such facts. It is our conclusion that the questions in dispute should have been submitted to the jury under appropriate instructions, and that the trial court erred in directing a verdict in favor of the plaintiff.
*154 Decided July 8, A. D. 1912.
Rehearing denied December 16, A. D. 1912.
Other assignments of error have not been overlooked, but it has not been considered necessary to dis-' cnss them, as, even if the objections should have been sustained, it will not be presumed that the errors will be repeated upon a new trial.
For the error of the court in withdrawing the cause from the jury and directing a verdict, the judgment will be reversed and the cause remanded for a new trial.
Morgan, J., not participating.